UNITED STATES of America, Appellee,

v.

Kenneth Lee MAZZAFERRO,
Defendant, Appellant.

No. 87–1559.

United States Court of Appeals,
First Circuit.

Heard Oct. 3, 1988.
Decided Jan. 23, 1989.

Theodore L. Craft, Boston, Mass., by Appointment of the Court, for defendant, appellant.

Jorge E. Vega–Pacheco, Asst. U.S. Atty., Crim. Div., San Juan, P.R., with whom Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., was on brief, for appellee.

Before COFFIN, Circuit Judge, BROWN,* Senior Circuit Judge, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

Defendant-appellant Kenneth Lee Mazzaferro appeals his guilty verdict and sentence stemming from charges related to marijuana possession. He claims that (i) his sixth amendment right to effective assistance of counsel was denied because of a conflict of interest resulting from his lawyer also being one of the lawyers of a co-defendant who entered into a plea agreement and testified against him at trial, and (ii) that the unduly harsh sentence he received was in retaliation for his refusal to plea bargain and his insistence upon his constitutional right to a trial.[1] We affirm the conviction and remand for resentencing.

## I. BACKGROUND

Mazzaferro and two co-defendants, Edward Foley and Mark Murray, were arrested by the United States Coast Guard on December 11, 1986 while on a boat 130 miles off the coast of Puerto Rico. Upon boarding the boat, a 50–foot long sailing vessel, the Coast Guard discovered 3,468 pounds of marijuana located in a locked cabin below the deck. Foley identified himself as the master of the vessel and Mazzaferro and Murray as the crew members.

---

* Of the Fifth Circuit, sitting by designation.

1. Appellant also raises other issues which we find do not merit discussion.

All three men were indicted on December 17, 1986 on three counts: Count I—being a person aboard a vessel subject to the jurisdiction of the United States and possession with intent to distribute a controlled substance (18 U.S.C. § 2; 21 U.S.C. §§ 955a(a) and (f)); Count II—possession with intent to distribute a controlled substance by a United States citizen (18 U.S.C. § 2; 21 U.S.C. §§ 955a(b) and (f)); and Count III—possession with intent to import into the United States a controlled substance (18 U.S.C. § 2; 21 U.S.C. §§ 955a(d)(1) and (f)).

All three co-defendants were represented by a single attorney, Mr. Morales Sanchez, at the bail and detention hearing on December 23, 1986. At this hearing, the magistrate briefly noted the general hazards of joint representation but did not ask the defendants whether they had discussed the potential conflict with their attorney or whether they understood the magistrate's admonishments, nor did he inform them of their right to a court-appointed lawyer if needed.

On January 22, 1987, co-defendant Foley dismissed Morales and hired Attorney Quinones. Foley also retained Attorney Gross *pro hac vice.* On February 4, 1987, co-defendant Mazzaferro dismissed Morales and also hired Attorney Quinones. On February 5, 1987, co-defendant Murray dismissed Morales and hired Attorney Sanchez Rivera. Thus, both Foley and Mazzaferro were represented in some capacity by Attorney Quinones: Foley being jointly represented by Quinones and Gross, and Mazzaferro being solely represented by Quinones.

Attorney Quinones filed various pre-trial motions on behalf of both of these co-defendants. In a "Motion Requesting Hearing to Discuss Appearance as Joint Defense Attorney," dated February 11, 1987, Quinones attested that the right "to have adequate individual assistance of counsel in accordance with the sixth amendment of the United States Constitution [has] been thoroughly discussed with both Mr. Foley and Mr. Mazzaferro.... [And] that they foresee, as the undersigned [Quinones] also perceives, no conflict nor difficulties with regards to the undersigned appearing as

co-counsel with Mr. Robert Gross for Mr. Edward Foley and as counsel for Mr. Kenneth Mazzaferro." The district court did not schedule a hearing on this issue of joint representation and possible conflict of interest until just before the actual trial began on March 2, 1987.

At this hearing, the district court judge explained to the two co-defendants, Mazzaferro and Foley, the possible dangers of joint representation, and told them of their right to separate representation and their right to have a court-appointed lawyer if needed. The judge raised various hypotheticals in which a conflict could arise: a lack of investigation as to one of the defendants; inhibition of independent plea negotiations; inhibition of communicating to one of the defendants what the other defendant said to the attorney because of the attorney-client privilege; the decision to waive a jury trial; the decision to take the stand; formulation of defense strategies; preventing the attorney from challenging admissibility of evidence or introducing evidence favorable to one defendant and prejudicial to the other defendant; inhibition of full cross-examination of a government witness in order to protect the other defendant; inhibition in final argument in blaming one of the defendants; and inhibition in engaging in post-trial negotiations with the government. Mazzaferro and Foley, nevertheless, expressed their desire to continue with the joint representation of Attorney Quinones. Attorney Gross stated at the hearing that "Mr. Quinones is my local counsel on behalf of Ed Foley and ... that we have structured this in such a way that we are actually somewhat independent of each other in our defenses.... And if we do proceed to trial in arguing this case to the jury, I will be standing for Mr. Foley.... [And] Mr. Quinones will be representing Mr. Mazzaferro."

After the hearing on March 2, 1987, co-defendants Foley and Murray each entered into a plea agreement with the government: they pled guilty to Count I and agreed to testify against Mazzaferro; the government dismissed Counts II and III and agreed to abstain from making any sentencing recommendation. Mazzaferro

did not enter into a plea agreement and insisted upon a trial.

In view of the guilty pleas of Foley and Murray, the district court inquired again on March 3, 1987 if Mazzaferro perceived any conflict of interest as a result of his own lawyer, Quinones, having also represented Foley. Mazzaferro again indicated that he had no reservations about Quinones representing him, and signed a waiver to that effect ("Acknowledgement of Joint Representation Admonishment").

On March 3, 1987, the jury trial was commenced against Mazzaferro. At the trial, the government called as witnesses members of the Coast Guard boarding party, Customs officials, and Foley. Foley testified in essence as follows: that he himself "took care of everything" regarding the management of the boat; that Mazzaferro and Murray "assisted [him] in sailing the boat;" that Foley did "not talk about it [the venture to pick up the marijuana] much" with Mazzaferro; that Foley "was never really sure until [he] left anchor" that Mazzaferro was going with him on the trip; that Foley "had no idea" what Mazzaferro was doing while Foley was loading the marijuana onto the boat; that it was possible for the loading to have occurred without Mazzaferro's knowledge; that the loading occurred at night and Mazzaferro might have been sleeping at the time; and that Foley alone locked the cabin doors where the marijuana was stored. This was hardly damning testimony. On a question, however, from the trial court as to whether "Mr. Mazzaferro and Mr. Murray [were] aware of the fact that the venture was to transport marijuana," Foley responded "Yes, I believe so."

The cross-examination of Foley by Attorney Quinones was extremely short and dealt exclusively with Foley's plea agreement. Foley testified that his guilty plea was the result of extensive negotiations with the government, and that the government had, on many occasions, denied him a deal because Mazzaferro was insisting on a trial.

Attorney Quinones did not present any evidence in the defense of Mazzaferro—

Mazzaferro did not testify, nor were any other witnesses called on his behalf. The jury found Mazzaferro guilty on all three counts.

On May 4, 1987, Mazzaferro was sentenced on Count I to 20 years imprisonment and a fine of $25,000, and on Counts II and III to 20 years imprisonment each, to be served concurrently. In addition, he was sentenced to supervised release of 5 years on the three counts, to be served concurrently. The two co-defendants, Foley and Murray, who had entered into plea agreements, were each sentenced to 10 years on Count I and to supervised release of 5 years. On September 3, 1987, Mazzaferro filed a motion for reduction of sentence, on which the district court judge stated he would not rule pending decision of this appeal.

## II. JOINT REPRESENTATION AND CONFLICT OF INTEREST

Mazzaferro claims that he was denied effective assistance of counsel because his lawyer, Quinones, had a conflict of interest. His argument runs as follows. Quinones, along with another attorney, Gross, was also representing co-defendant Foley. Foley pleaded guilty and at trial testified for the government against Mazzaferro, and thus Quinones was placed in the untenable position of having to cross-examine his own client Foley. The government, on the other hand, asserts that Quinones was only acting as local counsel for Attorney Gross who was representing Foley *pro hac vice*, that no conflict of interest existed, and that Mazzaferro agreed to Quinones' joint representation.

The right to counsel is a fundamental right guaranteed by the sixth amendment. Assistance of counsel is among those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed. 2d 705 (1967). Requiring an attorney to represent two co-defendants whose interests are in conflict has long been held to be violative of the sixth amendment right to effective assistance of counsel. *Glasser v.*

*United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942). The Supreme Court, however, has also held that "[r]equiring or permitting a single attorney to represent codefendants ... is not *per se* violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978). *See also Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980) ("the possibility of conflict is insufficient to impugn a criminal conviction"). Multiple representation violates the sixth amendment only if it gives rise to an actual conflict of interest. *Holloway*, 435 U.S. at 482, 98 S.Ct. at 1177.

The Federal Rules of Criminal Procedure require that the court inquire personally into every case of joint representation of multiple defendants and advise each of his right to separate counsel. Rule 44(c) states: "Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel."

The procedure that must be followed in the First Circuit has been clearly articulated:

> [I]t shall be the duty of the trial court, as early in the litigation as practicable, to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel, or if qualified, may have counsel appointed by the court and paid for by the government. For the time being, at least, we leave to the discretion of the trial court the exact time and form of the inquiry.

*United States v. Foster*, 469 F.2d 1, 5 (1st Cir.1972). *See also United States v. Waldman*, 579 F.2d 649, 652 (1st Cir.1978) (defendant's waiver of separate counsel was adequate because magistrate did warn them of dangers and indicated that they could get separate counsel, and because the

defendants stated that they understood the problem, that they had discussed it with their attorney, and that they preferred to have the same lawyer); *United States v. Donahue*, 560 F.2d 1039, 1042 (1st Cir. 1977) (the rule enunciated in *Foster* "applies with equal force to representation of two or more defendants by members of the same law firm"). *But see United States v. Bader*, 698 F.2d 553, 558 (1st Cir.1983) (while appellate court was "disturbed" that the magistrate did not make the multiple representation inquiry required by *Foster*, it nevertheless upheld the district court).

■ If a satisfactory inquiry does not appear on the record, the government has the burden of persuasion of demonstrating that prejudice to the defendant was improbable. *Foster*, 469 F.2d at 5. If, however, a satisfactory inquiry is carried out by the court, then it is the defendant who bears the burden of persuasion that he was deprived of a fair trial resulting from a conflict of interest arising from the joint representation. *Id. See also United States v. Martorano*, 620 F.2d 912, 915–16 (1st Cir. 1980).

■ Our initial inquiry must therefore be whether Mazzaferro was properly apprised of possible dangers inherent in joint representation, and if he was, whether he made a knowing, intelligent, and voluntary waiver regarding such joint representation. *See Glasser*, 315 U.S. at 70, 62 S.Ct. at 465; *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). We conclude that in the instant case, the *Foster* hearing requirements have been met. At the hearing on March 2, 1987, the district court judge explained and explored the risks of joint representation. He admonished Mazzaferro of possible dangers, explicitly suggested a variety of scenarios in which possible conflicts could arise, questioned him as to his understanding of those conflicts, and informed him of his right to have a court appointed attorney. Nevertheless, Mazzaferro agreed to proceed with the joint representation by Quinones and signed a waiver to that effect. We find no fault with the district court's inquiry. We do note, however, that given the admonish-

ment in *Foster* that the inquiry be conducted "as early in the litigation as practicable," *Foster*, 469 F.2d at 5, it would have been preferable to have had the inquiry earlier than just prior to commencement of the trial.

■ Since a proper *Foster* hearing was carried out in the instant case, we must next determine if Mazzaferro has met his burden of showing that he was deprived of a fair trial because of a conflict of interest from the joint representation. *Foster*, 469 F.2d at 5.

The currently articulated standard for showing a violation of sixth amendment rights in joint representation situations is that the defendant *"must establish that an actual conflict of interest adversely affected his lawyer's performance."* *Cuyler*, 446 U.S. at 350, 100 S.Ct. at 1719 (emphasis added). But a showing of prejudice is not required; in joint representation situations, the defendant "need not demonstrate prejudice in order to obtain relief." *Id.* at 349–50, 100 S.Ct. at 1718–19. *See also Holloway*, 435 U.S. at 490, 98 S.Ct. at 1181 ("a rule requiring a defendant to show that a conflict of interest ... prejudiced him in some specific fashion would not be susceptible of intelligent, even-handed application"); *Chapman v. California*, 386 U.S. 18, 43, 87 S.Ct. 824, 837, 17 L.Ed.2d 705 (1967) (Stewart, J., concurring) (a conviction must be reversed if trial error regarding joint representation occurred, even if no particular prejudice is shown and even if the defendant was clearly guilty); *Glasser*, 315 U.S. at 76, 62 S.Ct. at 467 ("The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."); *cf., Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) (in general claims of ineffective assistance of counsel, as opposed to specific conflict of interest situations, prejudice must actually be shown).

Application of the two-prong test concerning joint representation laid out in *Cuyler*—(i) an actual conflict of interest which (ii) adversely affects the lawyer's performance—compels the conclusion that there has been no sixth amendment violation in the instant case.

*Conflict of Interest:*

Although Quinones was the sole attorney for Mazzaferro, he only served as *local counsel* to co-defendant Foley, who was primarily represented by Attorney Gross *pro hac vice*. Quinones did file certain pre-trial motions for both Foley and Mazzaferro, but it was stated by Attorney Gross at the pre-trial hearing that "we have structured this in such a way that we are actually somewhat independent of each other in our defenses.... And if we do proceed to trial in arguing this case to the jury, I will be standing for Mr. Foley.... [And] Mr. Quinones will be representing Mr. Mazzaferro." The record provides no evidence of any active involvement by Attorney Quinones in Foley's defense—for example, in interviews, strategy decisions, or plea negotiations. It is worth noting that even in a situation where two lawyers in the same law firm each represented a different co-defendant in separate trials (where it would have been in each defendant's interest to implicate the other co-defendant and exonerate himself), and where the lawyers shared legal research, discussed the cases, assisted each other in trial, and where the defendant's lawyer even prepared the appellate brief for the co-defendant, it was held that such "overlap of counsel ... did not so infect [the attorney's] representation as to constitute an active representation of competing interests" so as to violate the sixth amendment. *Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987).

Mazzaferro has failed to present any evidence that an actual conflict of interest existed, other than the fact that Attorney Quinones was local counsel for co-defendant Foley, as well as Mazzaferro's lawyer. This fact alone, however, in light of the Supreme Court's holding that joint representation is not "per se violative" of the sixth amendment, *Holloway*, 435 U.S. at 482, 98 S.Ct. at 1177, does not create an actual conflict of interest.

*Conflict Adversely Affecting Lawyer's Performance:*

A case can arguably be made that Attorney Quinones did not fully or adequately cross-examine the government's witness, co-defendant Foley. During Quinones' cross-examination of Foley, Quinones did not pursue Mazzaferro's possible lack of knowledge of the marijuana smuggling or his limited role in the operation. There are a line of court decisions which have found the evidence insufficient to sustain a guilty verdict when the government can only show that crew members were present on a boat carrying marijuana and cannot show that they had knowledge of the presence of the drugs. *See United States v. Elkins,* 774 F.2d 530 (1st Cir.1985); *United States v. Bland,* 653 F.2d 989, 996–97 (5th Cir. 1981); *United States v. Mehtala,* 578 F.2d 6, 10 (1st Cir.1978); *United States v. Francomano,* 554 F.2d 483, 487 (1st Cir.1977).

The vital question, however, is whether Quinones' arguably less than vigorous cross-examination was attributable to any conflict of interest. We answer this question in the negative. Foley had already pled guilty. Thus, this was not a situation where Quinones was put in the position of trying to protect one client, Foley, at the expense of his other client, Mazzaferro. Nor can we conclude that Quinones' failure to put Mazzaferro on the stand resulted from any conflict of interest. Whether a defendant testifies on his own behalf or not is the kind of strategic decision that defense lawyers constantly make, and there is no evidence in this instance to suggest that Mazzaferro's not taking the stand stemmed from any decision to protect Foley, who had already pled guilty.

Although it can be argued that a more rigorous defense should have been undertaken by Quinones, we cannot second-guess the reasons for Quinones' trial strategy. And most importantly, Mazzaferro presents no evidence to suggest that any defense tactics or strategy were followed because of a conflict between his interests and Foley's interests.

For the following reasons we conclude that there was no conflict of interest by Quinones which adversely affected his defense of Mazzaferro. Quinones was only acting as local counsel for Foley. There is nothing in the record to support any significant involvement by Quinones in Foley's defense. Foley had pled guilty before Mazzaferro's trial, thereby obviating any conflict with regards to pursuing culpability of one defendant at the expense of the other. There was no evidence presented which suggests that Quinones altered his defense of Mazzaferro in any way because of his relationship to Foley. In short, there is nothing to indicate that Mazzaferro did not receive a fair trial because of the joint representation. Thus, we hold that Mazzaferro was not denied his sixth amendment right to effective assistance of counsel.

█ While we hold in the instant case that no evidence for a conflict of interest has been presented and Mazzaferro was not adversely affected, we believe that the loyalty a lawyer owes to his client is so basic to rendering effective assistance that it should not be sullied by even the appearance of a possible conflict. To avoid undermining confidence in the adversarial process, and to bolster the principle that an attorney should give exclusive loyalty to a single client, we strongly advise the district courts in all future criminal cases ordinarily to refuse to allow a single attorney to appear as both local counsel for one co-defendant and as regular counsel for another co-defendant.

It has long been recognized that there are inherent difficulties in assessing possible conflicts of interest. *See, e.g., Holloway,* 435 U.S. at 490, 98 S.Ct. at 1181 ("in a case of joint representation of conflicting interests the evil ... is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process," and therefore it is difficult to assess the impact of any conflict). And the knowing signing of a waiver does not necessarily cure the problems created by multiple representation. As the Supreme Court has recently stated: "[f]ederal courts have an independent interest in

ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States,* —— U.S. ——, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988).

> [T]he District Court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.

*Id.* 108 S.Ct. at 1699.

Because of such potential problems, we think it is ordinarily undesirable for a district court to allow a single attorney to appear as local counsel for one defendant and regular counsel for a co-defendant. While it is clear that the sixth amendment's guarantee of assistance of counsel also comprehends the right to select one's own attorney, *see, e.g., Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932) and *Glasser,* 315 U.S. at 70, 62 S.Ct. at 465, this right is not absolute. *Wheat,* 108 S.Ct. at 1697. We believe that a district court acts wisely and well within its authority if it refuses to allow the instant situation to occur, it being one where the right to choose one's counsel is overcome by the potential for a conflict of interest or the appearance of one. *Id.*

### III. THE SENTENCE

■ Mazzaferro also claims that he received an unduly harsh sentence in retaliation for his refusal to plea bargain and his insistence upon his constitutional right to a trial. Co-defendants Foley and Murray entered plea agreements with the government in which they pled guilty to Count I in exchange for Counts II and III being dropped, agreed to testify,[2] and received assurances that the government would abstain from making any sentencing recommendations. Each received a 10 year sentence. Mazzaferro received a 20 year sentence and a $25,000 fine on Count I, and concurrent 20 year sentences for Counts II and III. An examination of the circumstances surrounding each defendant regarding their respective roles in the crime charged and their past criminal records raises serious questions concerning the disparity between Mazzaferro's sentence and those of his co-defendants, Foley and Murray.

The record shows that Mazzaferro had a much more limited role in the drug operation than Foley. Foley's testimony, as witness for the government, was to the following effect: that Foley was captain of the vessel and Mazzaferro was only a crew hand; that Foley "took care of everything;" that it was not even certain that Mazzaferro would be present on the trip until they left anchor; that Foley loaded the marijuana onto the vessel and that Mazzaferro may not even have been aware of the loading; and that Foley alone locked the cabin door where the marijuana was stored. Nor was there any evidence that Mazzaferro had any financial interest in the boat or the contraband.

Moreover, Mazzaferro had a very limited criminal record. The pre-sentence report indicates that Mazzaferro's only prior offenses were in 1962 when he was sentenced to 20 days maximum for impairing the morals of a minor, and in 1965 when he was sentenced to 10 days or a $50 fine for shoplifting. (A 1978 charge of paying a restaurant bill by personal check lacking sufficient funds was resolved without any criminal disposition. *See* Sentencing Hearing transcript at 3–4.). In contrast, the trial judge referred to Foley's pre-sentence report as containing "a whole string of things ... [that] look like red flags, like alarms that tell you this gentleman Mr. Foley, is going to get into deeper trouble one day." In sentencing Murray, the judge took into consideration that he had a Bachelor's degree in Art, a Master of Science's degree in Public Health and was a Master of Science major in Social Administration.

In light of the evidence which establishes that Foley played the key role in the smug-

---

**2.** Only Foley was called as a witness.

458

gling venture and that Foley had the more serious prior record, it is difficult to understand why Mazzaferro received a sentence twice as long as that of Foley. The trial judge gave no reasons for the glaring disparity in the sentences. In the face of such silence, we cannot rule out the possibility that the sentence was imposed in retaliation for Mazzaferro's insistence that he stand trial. Such a sentence would, of course, be unconstitutional.

One of the fundamental principles of our jurisprudence is that a defendant cannot be punished for exercising a constitutional right and that vindictiveness is to play no role in the sentencing of defendants.

> To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort ... and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is "patently unconstitutional."

*Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978). The Supreme Court has reiterated this principle in a long series of cases, generally in the context of resentencing a defendant who had successfully appealed his first conviction. The seminal case is *North Carolina v. Pearce*, 395 U.S. 711, 725, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656 (1969), where defendant's conviction was set aside for constitutional error and on retrial he was sentenced to a longer term of imprisonment than his original sentence. The Court held that the longer sentence was unconstitutional and that due process requires that vindictiveness play no part in the new sentence that a defendant receives after retrial. The Court stated that a defendant should "be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge."[3] *See also Wasman v. United States*, 468 U.S. 559, 574, 104 S.Ct. 3217, 3226, 82 L.Ed.2d 424 (1984); *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982); *Blackledge v. Perry*, 417 U.S. 21, 28, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974);

*Chaffin v. Stynchcombe*, 412 U.S. 17, 32 n. 20, 93 S.Ct. 1977, 1986 n. 20, 36 L.Ed.2d 714 (1973); *Brady v. United States*, 397 U.S. 742, 751 n. 8, 90 S.Ct. 1463, 1470 n. 8, 25 L.Ed.2d 747 (1970); *United States v. Jackson*, 390 U.S. 570, 581–82, 88 S.Ct. 1209, 1216, 20 L.Ed.2d 138 (1968).

In situations where a defendant is appealing a sentence, the Supreme Court has fashioned a rule to guard against the possibility of vindictiveness on the part of the sentencing judge:

> In order to assure the absence of such a motivation, we have concluded that whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And *the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.*

*North Carolina v. Pearce*, 395 U.S. at 726, 89 S.Ct. at 2081 (emphasis added). *See also United States v. Goodwin*, 457 U.S. 368, 374, 102 S.Ct. 2485, 2489, 73 L.Ed.2d 74 (1982) (to assess the "constitutional legitimacy" of an enhanced sentence, the "presumption of vindictiveness ... may be overcome only by objective information in the record justifying the increased sentence"); *Colten v. Kentucky*, 407 U.S. 104, 115, 92 S.Ct. 1953, 1959, 32 L.Ed.2d 584 (1972) (*Pearce* forbids "the imposition of greater punishment than was imposed after the first trial, absent specified findings"); *United States v. Miller*, 589 F.2d 1117, 1139 (1st Cir.1978) (defendant's failure to cooperate with authorities was a permissible evaluation of defendant's character in determining his sentence in light of the *entire context* of the sentencing statement, which elaborated on the defendant's prior criminal record and that he had played an important role in a massive violation of the law, and that "[t]he *articula-*

**3.** A principle recognized by us in *Marano v.*      *United States,* 374 F.2d 583 (1st Cir.1967).

*tion of these additional reasons* for maximum sentencing allays any fears we might have that the sentencing decision was tainted by impermissible considerations") (emphasis added), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). We think that this requirement for the inclusion of data in the record when an increased sentence is imposed also applies to a situation like the one before us where three defendants are sentenced for the same crime and one is given a much more severe sentence. *See United States v. Capriola,* 537 F.2d 319, 321 (9th Cir.1976) (per curiam) ("When there is substantial disparity in sentences imposed upon different individuals for engaging in the same criminal activity, [where some have pled guilty and others have gone to trial], the preservation of the appearance of judicial integrity and impartiality requires that the sentencing judge record an explanation.").

We have directly addressed situations similar to the case at bar. In *Longval v. Meachum,* 693 F.2d 236 (1st Cir.1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1799, 76 L.Ed.2d 364 (1983), the trial judge told the defendant that if he refused to plea bargain, a substantial sentence might be imposed on him. The defendant did not plea bargain and he was sentenced to 40 to 50 years imprisonment, while his co-defendant, who did plead guilty, was sentenced to 3 years. Following *United States v. Goodwin,* 457 U.S. at 373, 102 S.Ct. at 2489, which articulated the standard that *a presumption of vindictiveness arises whenever* a detrimental action is taken after a defendant exercises a legal right in circumstances in which there is a *"reasonable likelihood of vindictiveness,"* we held that "the on-the-surface differential, and the total sentence imposed, are too great to allay a reasonable apprehension that the sentencing judge's original remarks were unjudicial urgings to plead, and that the sentences were a retaliatory consequence of the defendant's refusal." *Longval,* 693 F.2d at 238. We explicitly rejected a rule that would have "required a defendant to make a prima facie case of actual vindictiveness on the part of a judge ... [because it] would impose an almost impossible burden." *Id.* at 238. We ordered that

the defendant be resentenced before a new judge. *Id.* at 239. We reaffirmed this position in *United States v. Crocker,* 788 F.2d 802 (1st Cir.1986), a case in which the defendant exercised his constitutional right to stand trial and the district judge remarked that presentation of a frivolous case which wasted judicial resources could be factors in determining the sentence he imposed. We held that these remarks were "sufficient to establish that there was a reasonable likelihood of vindictiveness in imposition of harsher sentence [3 years imprisonment] on the defendant," as compared to the co-defendants who had pled guilty and had each received 2 year sentences. *Id.* at 809. We ordered the sentence vacated and the case remanded for resentencing by another judge. *Id.*

Our position is in accord with that of other circuits. *See Fielding v. LeFevre,* 548 F.2d 1102, 1106 (2d Cir.1977) (a judge's threat of a more severe sentence should the defendant go to trial is a *"per se* violation of the defendant's sixth amendment right to a trial, and require[s] resentencing before a different judge"); *Hess v. United States,* 496 F.2d 936, 938 (8th Cir.1974) ("This circuit has joined a host of other courts in recognizing that whether a defendant exercises his constitutional right to trial by jury to determine his guilt or innocence must have no bearing on the sentence imposed."); *United States v. Marzette,* 485 F.2d 207, 207 (8th Cir.1973) (if a sentencing court "added any punitive measure to the sentence simply because the defendant chose to exercise his right to trial by jury," there would be "grave doubt as to the validity of the sentence"); *United States v. Stockwell,* 472 F.2d 1186, 1188 (9th Cir.) (once it appears that a harsher sentence has followed a breakdown in plea-bargaining negotiations, "the record must affirmatively show that the court sentenced the defendant solely upon the facts of his case and his personal history, and not as punishment for his refusal to plead guilty"), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); *United States v. Hopkins,* 464 F.2d 816, 822 (D.C.Cir. 1972) (defendant's sentence "was not to depend upon his refusal to express remorse"); *Scott v. United States,* 419 F.2d

264, 274 (D.C.Cir.1969) (trial judge should not create incentives for guilty pleas by a policy of differential sentences); *Baker v. United States,* 412 F.2d 1069, 1073 (5th Cir.1969) ("An accused cannot be punished by a more severe sentence because he unsuccessfully exercised his constitutional right to stand trial rather than plead guilty."), *cert. denied,* 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); *United States v. Wiley,* 278 F.2d 500, 503–04 (7th Cir.1960) (sentence of three years set aside where it was imposed upon defendant who was merely an accessory and who had no record of prior convictions but who had pleaded not guilty and asked for a trial, and where the ringleader who had four prior felony convictions and who had pleaded guilty was sentenced to only two years imprisonment).[4]

One of the purposes of the sentencing guidelines is to reduce disparity in sentences of different defendants for the same crime. We note that if the sentencing guidelines had been in effect at the time that appellant was sentenced, the sentence prescribed would have been between 10 years and 1 month to 12 years and 7 months. This contrasts starkly with the 20 year sentence imposed.

The sentencing facts in this case are uncontradicted: Three defendants were indicted for the same crime. Two pled guilty prior to trial. The appellant asserted his constitutional right to stand trial. The evidence at trial established that appellant had played a minor role in the crime. One of the defendants (Foley) who pled guilty was the prime mover in carrying out the crime. This defendant had a more extensive prior record than did appellant. Both the defendants who pled guilty prior to trial re-

ceived 10 year sentences. Appellant was given a 20 year sentence. The sentencing judge gave no reason for the sentence differential of 10 years.

These facts raise a strong inference that the additional 10 years given appellant was in retaliation for the exercise of his constitutional right to stand trial. The law is clear beyond peradventure that a sentence based on retaliation for exercising the constitutional right to stand trial is invalid. Without drawing any conclusions as to the district court's actual reasons for appellant's sentence, we believe that the appearance of retaliation is great enough on the facts of this case to require that the sentence imposed be set aside and the case remanded for resentencing by a different judge.

Conviction affirmed. Remanded for resentencing.

---

**4.** These cases are to be distinguished from *United States v. Quejada–Zurique,* 708 F.2d 857 (1st Cir.1983), *cert. denied,* 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983), which upheld the disparate sentences of the defendants who chose to go to trial, as compared to a co-defendant who pled guilty, because the sentences were imposed by *two different judges,* and thus eliminated the possible appearance of vindictiveness. *See United States v. Crocker,* 788 F.2d at 809 (the *Quejada–Zurique* opinion "does not stand for the proposition that a court may impose a harsher sentence because a defendant chooses to stand trial and the court considers the case

unworthy of its time and effort"); *cf. United States v. Floyd,* 519 F.2d 1031, 1034–35 (5th Cir.1975) (in determining potential vindictiveness, the "focus should be upon the institutional interests involved" and even when, upon retrial, a different judge of the same court imposes a harsher sentence without knowledge of what the first judge had done, the "same sort of hazard exists [as condemned in *Pearce* ] that the defendants will be deterred in exercising their right to seek review because of a reasonable apprehension that judges who work together daily and must preside at each other's retrials will have a stake in discouraging such reviews").