**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James B. FROST (89–5144/5145) and Charles L. Griffin (89–5146/5147),
Defendants–Appellants.**

**Nos. 89–5144, 89–5145, 89–5146
and 89–5147.**

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 9, 1989.

Decided Sept. 13, 1990.

---

John W. Gill, Jr., U.S. Atty., Knoxville, Tenn., Gary Humble, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Chattanooga, Tenn., for U.S.

Julie W. Watson, Roger W. Dickson (argued), Barry L. Gold, Caldwell, Heggie & Helton, Chattanooga, Tenn., for James B. Frost.

Sam D. Elliott, William H. Horton, Charles J. Gearhiser, (argued) Gearhiser, Peters & Horton, Chattanooga, Tenn., for Charles L. Griffin.

Before JONES and RYAN, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

RYAN, Circuit Judge.

Defendants James B. Frost and Charles L. Griffin appeal their convictions for conspiracy in violation of 18 U.S.C. § 371, bribery of a bank officer in violation of 18 U.S.C. §§ 215 and 2, and misapplication of bank funds in violation of 18 U.S.C. §§ 656 and 2. We conclude that the evidence supports the convictions of both defendants. The district court did not abuse its discretion and the conduct of the prosecutors did not rise to the level of a constitutional violation. We have carefully considered all arguments raised by defendants and find them to be meritless. For the reasons detailed below, we affirm.

## I.

The occurrences leading to the criminal charges in the instant cases primarily involve four individuals: William Hunt, president of Pioneer Bank ("the bank"); James Frost, a certified public accountant whose firm audited the bank's trust department; Charles Griffin, a businessman and member of the bank's board of directors; and Norman Watson, a real estate syndicator.

## A.

In July 1981, a partnership, Oil Equipment Associates ("OEA"), was created in which defendant Frost received fifty percent of profits and defendant Griffin and Norman Watson each received twenty-five percent. The next day, Frost executed a written participation agreement with Hunt providing that Hunt would share equally in Frost's rights and obligations in OEA. The Frost/Hunt participation agreement was not made public. Frost directed his secretary to keep the agreement locked up and told her that no one should know about Hunt's involvement in OEA.

Pioneer Bank's policies prohibited loaning money to employees or to partnerships of employees. Hunt's interest in the OEA partnership was not disclosed to the bank. About the time OEA was formed and the Frost/Hunt agreement executed, Pioneer Bank loaned OEA approximately $506,000.[1] Hunt authorized the loan and when later presenting facts concerning the loan to the bank's Executive Committee for approval, Hunt did not mention his interest in OEA. Watson explained why Hunt was paid by Watson, Frost and Griffin: "Well, [Hunt] was part of the partnerships. We brought him in, we paid him so that he would make the loans and we, in effect, bought us a banker."

From September 22, 1981 until April 13, 1983, Hunt authorized four more loans from the bank to OEA. The loans totaled $4.8 million and Hunt received $90,000 through the partnership. The board was never informed of Hunt's interest in OEA.

Hunt became concerned that Watson's total debt at the bank exceeded federal and state lending limits and he communicated those concerns to Frost, Griffin and Watson. The group removed Watson from the OEA partnership agreement and made him a silent or *de facto* partner like Hunt.

---

1. The $506,000 loan was used to buy equipment and to make possible a $200,000 distribution to the partners. Frost paid $49,000 to Watson and kept $147,000 himself. From that money, Frost paid Griffin and Hunt each $49,000. To transfer the money to Hunt, Frost wrote two checks ($25,000 and $24,000) on the same day from his Merrill Lynch account, an account opened in July 1981.

Griffin and Watson executed a participation agreement like the Hunt/Frost agreement where Griffin shared his profits equally with Watson.

## B.

Frost, Griffin and Watson also formed a partnership to buy the History Village Inn, a hotel in Athens, Georgia. At the same time, Frost and Hunt executed a participation agreement identical to their agreement in OEA. The partnership borrowed money from Pioneer Bank, under Hunt's authorization, to buy the hotel. Again, the bank was not informed of Hunt's interest in the partnership, either directly or on the partnership forms submitted to the bank. Hunt received money from Frost following the partnership's receipt of the loan and again when the hotel was sold. As with OEA, Frost paid Hunt through his Merrill Lynch account with several checks written the same day.

## C.

Frost, Griffin, and a local businessman had earlier formed The Omega Group, Inc., a real estate investment firm and a customer of the bank. Watson bought the businessman's share in April 1984, and the group then gave Hunt a stock option which essentially made him a partner. Hunt authorized loans to Omega but did not disclose his interest to the bank's board.

## D.

In December 1984, Hunt agreed to loan $5.5 million to U.S. Shelter Corporation. Watson and his friend, the president of U.S. Shelter, "arranged the deal." The transaction involved a loan from the bank to U.S. Shelter and then a corresponding loan from U.S. Shelter to Quadel Corporation, a firm that acquired, developed, and then resold real estate.[2] Quadel applied the money it received toward its outstanding debt at the bank. Quadel would make payments to U.S. Shelter and U.S. Shelter

would then make payments to the bank. U.S. Shelter was informed that it would not bear ultimate liability for the loan repayment, but that Quadel and the partners would be responsible for repayment to the bank.

Hunt testified that this transaction occurred because of his concerns regarding the concentration of debt to Quadel and upcoming bank examinations. Hunt stated that "[t]he purpose of making the loan was purely and completely to get the Quadel Corporation under the bank's legal lending limit." Hunt had communicated his concerns to Frost and Griffin prior to the arrangement of this transaction. After the loan was completed, Hunt told Frost and Griffin that he thought "Mr. Watson had pulled it out of the fire possibly for this period by arranging this loan with U.S. Shelter."

## E.

Defendants were also involved in transactions concerning apartment complexes. Frost advised clients to sell two apartment complexes, Concorde Village and Seminole Ridge, for tax reasons. Frost, apparently in his role as a member of the Omega Group, arranged a sale and received a $200,000 fee for his services. At a "simultaneous closing," the owners sold the two apartment complexes to U.S. Shelter and U.S. Shelter immediately sold the complexes, for the same price, to Quadel. The ultimate purchaser was a limited partnership arrangement formed by Quadel. Hunt authorized two loans totaling approximately $500,000 for the down payment on the apartment complexes. Hunt testified that he knew when he made the loan that the partners, Hunt, Watson, Frost and Griffin, would each receive a fee when the transaction occurred. Again, Hunt received his money in the form of several checks written by Frost on his Merrill Lynch account. The bank board was not informed of Hunt's interest in the loans,

---

**2.** Quadel had several subsidiaries, both partnerships and corporations. Quadel Energy Corporation was OEA's largest customer, and Frost

and his accounting firm did accounting work for Quadel.

even by Griffin who was a member of the bank's Executive Committee.

### F.

In April 1985, Frost, Griffin, Watson and Hunt formed a partnership named Frost and Griffin Company. Frost and Griffin were listed as partners in the agreement, but participation agreements like those discussed above made Hunt and Watson equal, hidden partners. Frost and Griffin Company borrowed approximately $2.4 million from the bank and then loaned that money to Quadel. Quadel applied the money toward the outstanding balances on the bank loans to it and to OEA. The bank, of course, was not informed of Hunt's interest in Frost and Griffin Company.

Hunt testified that it had become "very apparent that the FDIC was going to examine the bank momentarily, and that if they did, we were going to have a legal limit problem." Hunt stated that he continued to communicate his concerns over upcoming examinations to Griffin, Frost and Watson. Frost and Griffin suggested forming Frost and Griffin Company as a way to bring Quadel's debts under the legal lending limit.

### G.

In November 1985, Roger Holley, Vice President of the bank, began an investigation of overdrafts. Mr. Holley found total related debt to Quadel in excess of legal lending limits and checks from Frost in Hunt's account. Hunt's forced resignation occurred on November 14, 1985.

**3.** Count One alleged a conspiracy to bribe a bank official, to misapply bank funds and to deceive the Federal Deposit Insurance Corporation ("FDIC"), a violation of 18 U.S.C. § 371. Counts Two, Three, Six and Seven charged defendants with violating 18 U.S.C. §§ 215 and 2, paying money to the bank president to influence him in connection with the bank's business. Counts Four, Five, and Eight charged defendants with misapplications of bank funds, violations of 18 U.S.C. §§ 656 and 2.

### II.

On October 12, 1988, defendants Frost and Griffin were charged in a superseding indictment with eight counts of violating 18 U.S.C. § 371; 18 U.S.C. §§ 215 and 2; and 18 U.S.C. §§ 656 and 2.[3]

On November 2, 1988, a jury found defendants Frost and Griffin guilty of all counts charged. Both defendants filed a motion for a judgment of acquittal notwithstanding the verdict or, alternatively, a new trial; the district court denied those motions on December 16, 1988. The court sentenced Frost to a total of nine years imprisonment and $800,000 in restitution to be paid to Pioneer Bank.[4] Griffin received an effective total sentence of four and one-half years imprisonment and $800,000 restitution to Pioneer Bank.[5]

Both defendants filed motions to amend or alter the sentence and the restitution order. The district court extended the time within which restitution could be made but otherwise refused to alter the prison sentence and restitution.

Defendants appeal, requesting this court to reverse and vacate the guilty verdict and judgment or, alternatively, to grant a new trial or to reduce the prison sentence and restitution.

### III.

Defendants raised numerous assignments of error:

1. Whether the evidence is sufficient to support the convictions of defendants.
 A. Conspiracy
 B. Bribery
 C. Misapplications
2. Whether the district court abused its discretion in the following areas:

**4.** Frost received the following prison sentence: five years imprisonment on Count One and four years on Count Eight, to run consecutively; one year each on Counts Two and Three, to run concurrently; and five years each on Counts Four, Five, Six and Seven, to run concurrently.

**5.** Griffin received the following prison sentence: four and one-half years imprisonment each on Counts One, Four, Five, Six, Seven and Eight, to run concurrently; and one year each on Counts Two and Three, also to run concurrently.

A. Denial of severance motion.

B. Denial of continuance motion.

C. Charge to the jury.

1) Refusal to give missing witness jury instruction.

2) Refusal to give perjured testimony jury instruction.

3) Examples of misapplications of bank funds.

D. Evidentiary rulings.

1) Hunt's testimony

2) Oldham's testimony

3. Whether defendants' right to a fair trial was violated by the following acts:

A. Alleged prosecutorial misconduct.

1) Injection of civil standards.

2) Comments concerning lifestyle.

3) Comments concerning activities of others.

4) Alleged withholding of *Brady* material.

5) Other acts of misconduct.

B. Allegedly improper cross-examination of character witnesses.

C. Polling of the jury.

4. Whether the district court abused its discretion in sentencing the defendants.

A. Prison sentences.

B. Restitution.

## IV.

### 1. *Sufficiency of the Evidence*

Defendants argue that the verdict on some or all of the counts was against the weight of the evidence and that the evidence introduced was insufficient to sustain their convictions.

When reviewing claims of insufficient evidence, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *quoted in United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986). "Circumstantial evidence is entitled to the same weight as direct evidence in this calculus [of determining sufficiency]." *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), *quoted in Gallo*, 763 F.2d at 1518. Additionally, "the uncorroborated testimony of an accomplice may support a conviction under federal law." *Gallo*, 763 F.2d at 1518.

### A. *Conspiracy*

■ A conspiracy in violation of 18 U.S.C. § 371 requires an agreement to commit an unlawful act and an overt act in furtherance of the conspiracy. The agreement need not be a formal agreement; "the existence of a conspiracy may be inferred from acts done with a common purpose." *United States v. Ayotte*, 741 F.2d 865 (1984) (citations omitted). Under the *Pinkerton* doctrine, each member of a conspiracy becomes "responsible for acts in furtherance of the conspiracy committed by his co-conspirators." *Gallo*, 763 F.2d at 1519, *citing Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). We have agreed with the Eleventh Circuit's characterization of the *Pinkerton* doctrine and noted that "a court need not inquire into the individual culpability of a particular conspirator, so long as the substantive crime was a reasonably foreseeable consequence of the conspiracy." *Gallo*, 763 F.2d at 1519, n. 22.

■ The jury could properly have found the existence of an agreement and the required overt act. The secret participation agreements provide evidence supporting that view. Hunt testified that there was an agreement to keep his interest secret, and Watson agreed. Watson testified that the group made Hunt a partner solely because of his ability to lend the bank's money, and Frost warned Watson to think about an answer to "the key government question ... what did Mr. Hunt contribute to the partnership." Hunt testified that the payments did affect his lending decisions and that several of the actions taken were for the purpose of avoiding detection

by the FDIC and the state regulators of the lending limit violations.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found evidence supporting conviction of both defendants for conspiracy.

### B. *Bribery*

■ Defendants were charged with violating 18 U.S.C. §§ 215 and 2 by giving something of value to Hunt, a bank officer, in connection with bank business.[6] Defendants argue that the money paid to Hunt did not come directly from loan proceeds, apparently believing that if it did not, the payments would be outside of the scope of section 215. However, section 215 provides that giving "anything of value" is sufficient to show a violation, providing the other requirements have been met.

Hunt, unlike the other partners, was paid in numerous small checks written the same day. Watson testified that Hunt was made a partner so that he would loan money to the group. Hunt himself testified that the payments influenced his lending decisions. A rational trier of fact could interpret those facts to find the elements of sections 215 and 2 beyond a reasonable doubt.

### C. *Misapplications*

■ Defendants were also charged with misapplying bank funds in violation of 18 U.S.C. §§ 656 and 2. Section 656, in relevant part, provides:

> Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, ... embezzles, abstracts, purloins or willfully misapplies any of

the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employe or receiver, shall be fined ... or imprisoned or both.

18 U.S.C. § 656. Section 2 provides that anyone aiding and abetting or procuring commission of an offense is punishable as a principal. *See* 18 U.S.C. § 2.

Defendants argue that they did not have the knowledge and/or intent required for conviction. The evidence does not support their arguments. Frost testified that Hunt was made a partner in the transactions in a manner designed to keep the bank from knowing of Hunt's involvement. Frost took steps to keep the participation agreements secret. Frost and Griffin submitted various forms concerning the partnerships to the bank, concealing Hunt's interests on all of them. Griffin, a director of the bank, did not reveal Hunt's interests at the bank's board meetings.

We have held that "at the very least, the term misapplication '[means a] deceitful and dishonest mishandling of bank funds.'" *United States v. Walker*, 871 F.2d 1298, 1306 (6th Cir.1989) (citations omitted). In a case relied upon by defendants, we discussed proof of an aider and abettor's awareness of the principal's intent.

> Because it is often difficult to prove directly the awareness of aider and abettor of the principal's intent to injure or defraud a bank, courts have allowed the inference of such awareness to be drawn from other circumstances, and have allowed this inference to serve as a basis

**6.** Section 215 prohibits the conduct allegedly committed by defendants.

(a) Whoever—

(1) corruptly gives, offers, or promises anything of value to any person, with intent to influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution; or

(2) as an officer, director, employee, agent, or attorney of a financial institution, corruptly solicits or demands for the benefit of any

person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution; shall be fined ... or imprisoned ... or both....

....

(c) This section shall not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

18 U.S.C. § 215.

for finding the necessary intent to facilitate the commission of the substantive offense. [*United States v.] Cades*, 495 F.2d [1166] at 1169 (3d Cir.1974) ]. *See United States v. Giordano*, [489 F.2d 327 2d Cir.1973) ], *supra; Logsdon v. United States* [253 F.2d 12 (6th Cir.) ], *supra*. Thus, "[e]vidence of 'collaboration' or 'association' between the principal and his aides may be used to infer the aider's awareness of the principal's intent." *Cades*, 495 F.2d at 1169.

*United States v. Franklin*, 608 F.2d 241, 245 (6th Cir.1979). A rational trier of fact could find, from the facts discussed above, the elements necessary to convict defendants of misapplying bank funds in violation of 18 U.S.C. §§ 656 and 2.

### 2. District Court's Exercise of Discretion

We review matters within the discretion of the district court to determine whether the court abused its discretion. "[W]hen judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *McBee v. Bomar*, 296 F.2d 235, 237 (6th Cir.1961), *quoting In re Josephson*, 218 F.2d 174, 182 (1st Cir. 1954).

### A: Denial of Severance Motion

■ Each defendant argues that he was entitled to a severance, claiming that he suffered prejudice as a result of a "spillover" effect from evidence concerning the other defendant. Frost points to Griffin's position on the bank's board of directors and his knowledge of the bank's policies as a distinguishing feature. Frost claims that Griffin's "total involvement in all aspects of the case" prejudiced Frost because the jury was incapable of separating the culpability of each defendant. Griffin argues that the prosecution tried to apply a higher standard of conduct for Frost, a certified public accountant, than the law generally requires and that the heightened standard "spilled over" and prejudiced Griffin.

As we have noted, "the general rule is that parties who are jointly indicted should be tried together." *United States v. Davis*, 809 F.2d 1194, 1207 (6th Cir.), *cert. denied*, 483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987). To be excepted from the rule, a defendant "must carry the 'heavy burden of showing specific and compelling prejudice resulting from a joint trial which can be rectified only by separate trials.'" *Id., quoting United States v. Pickett*, 746 F.2d 1129, 1134 (6th Cir.1984), *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985). Even if an error has been made in joinder, such an error "requires reversal only 'if the misjoinder results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict.'" *Davis*, 809 F.2d at 1207, *quoting United States v. Lane*, 474 U.S. 438, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986). The reviewing court must also balance any harmful effect on the jury shown by defendants against "the need for speedy and efficient trials." *Davis*, 809 F.2d at 1207 (citations omitted).

Introduction of evidence inflammatory to one defendant but not directly applicable to a co-defendant fails to establish "substantial prejudice" as to the co-defendant. *United States v. Zalman*, 870 F.2d 1047, 1053 (6th Cir.1989). Such evidence is the sole support offered for defendants' arguments. The district court instructed the jury to consider the evidence separately for each defendant, and the jury convicted Griffin a day after it convicted Frost. Defendants fail to carry the "heavy burden" necessary to show that the trial court abused its discretion in denying a severance.

### B. Denial of Continuance Motion

■ The district court denied defendants' motion to continue. Both defendants cite the government's filing of a superseding indictment shortly before the start of the trial as the reason the district court should have granted a continuance. Griffin also asserts that the government's revelation that it had obtained checks likely to be introduced as evidence necessitated a

continuance for Griffin to analyze the checks.

Granting or denying a continuance is a matter within the discretion of the district court. "Broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616–17, 75 L.Ed.2d 610 (1982), *citing Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849–50, 11 L.Ed.2d 921 (1964).

We also look to the standard announced in *Ungar* to determine whether the district court has abused its discretion in denying a continuance. "There are no mechanical tests for deciding when a denial for continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *United States v. Wirsing*, 719 F.2d 859, 866 (6th Cir.1983), *quoting Ungar*, 376 U.S. at 589, 84 S.Ct. at 850. "[W]e look for a showing from the defendant of prejudice, *i.e.*, a showing that the continuance would have made relevant witnesses available, or would have added something to the defense." *Wirsing*, 719 F.2d at 866, *quoting United States v. Faulkner*, 538 F.2d 724, 729–30 (6th Cir.1976).

The superseding indictment in this case dropped one count charging misapplication. It also delineated defendants' interests in Quadel Corporation and added Norman Watson's name to the counts alleging violations of 18 U.S.C. §§ 215 and 2. The checks complained of by Griffin are checks from Quadel to Frost, Griffin, OEA and other partnerships in which defendants held interests.

Defendants have failed to show the required prejudice. Their primary concern, the "virtual waste" of time and resources by counsel to prepare a defense against the dropped charge, is not sufficient to show a violation of due process. The district court did not abuse its discretion by denying a continuance.

### C. *Charge to the Jury*

#### 1) *Refusal to Give Missing Witness Jury Instruction*

■ Defendants argue that the court erred by refusing to give jury instructions concerning the prosecution's failure to call certain witnesses, particularly George Clark, Jr., CEO of the bank. They claim that Clark was "peculiarly within the power" of the prosecution and that his testimony would have "elucidated" the transaction at issue. No evidence showed that defendants could not have subpoenaed Mr. Clark.

Fulfillment of a two-part test is necessary before an adverse inference can be drawn from the failure of a party to call a witness: 1) the witness must be "peculiarly within [the opposing party's] power to produce," and 2) the witness' testimony would "elucidate the transaction." *United States v. Blakemore*, 489 F.2d 193, 195 (6th Cir. 1973). Both elements must be present and the analysis must be "strictly applied." *Id.*

Establishing the first element depends not only on a witness' physical availability but also on his relationship to the party in the suit.

[P]racticality is the touchstone in this situation. There may be a relationship of such description (legal, personal, practical or perhaps even social) between a prospective witness and one party that would in a pragmatic sense make his testimony unavailable to the opposing party regardless of physical availability. Obviously, the potential situations are too numerous and varied to make possible a comprehensive and definitive enumeration. The trial judge, using his sound discretion, must determine the sufficiency of the relationship by ascertaining the practical effect of any connection between the prospective witness and the party against whom the inference is sought to be used as well as the materiality of the witness' testimony.

*Id.* at 195–96 n. 4.

Defendants claim that "[i]t is amply demonstrated by the transcript that a relation-

ship existed between the government and Clark, making Clark peculiarly within the power of the prosecution." Defendants vastly overstate the record. The transcript contains a discussion among counsel for defendants, government counsel, and the court concerning a dispute as to whether the prosecution ever told bank employees or directors not to talk to defendants' counsel. The government attorney claims he never gave that advice. After the judge said he wanted the bank employees and directors informed that they could talk to whomever they pleased, defendants' counsel responded by saying it was too late for that. The judge then cautioned defendants' counsel that they had three days before trial started, enough time to talk to bank employees and officers.

The facts of this case fail to meet the relevant two-part test. Since the record demonstrates that the witnesses were not "peculiarly within the government's power" to produce, the court did not abuse its discretion in refusing the missing witness jury instruction.

### 2) *Refusal to Give Perjured Testimony Jury Instruction*

Defendants argue that the court erred by refusing to instruct the jury regarding the testimony of a perjurer, claiming that Hunt failed to tell the truth to the FBI and to the grand jury.

■■■■ This matter falls within the discretion of the trial court. If the court thoroughly instructs the jury regarding the credibility of the witness and cautions the jury to use care in considering the validity of accomplice testimony, the court does not abuse its discretion in refusing to give a perjury instruction. *See United States v. Watson*, 623 F.2d 1198, 1206 (7th Cir.1980); *United States v. Evanchik*, 413 F.2d 950, 954 (2d Cir.1969). The court gave the jury detailed instructions concerning credibility and added the following instruction concerning Hunt and Watson:

> In this case, the Government called as its witnesses alleged accomplices, William S. Hunt, III and Norman V. Watson, with whom the Government has entered into

plea agreements providing for Messrs. Hunt and Watson to plead guilty to criminal charges without trial. These men have agreed to cooperate fully and truthfully with the Government in all matters relating to this case. Such plea bargaining, as it is called, has been approved as lawful and proper. However, it is possible that a witness who hopes to gain more favorable treatment in his case may have a reason to be untruthful because he wants to strike a good bargain with, or get a favorable sentence recommendation from the Government. So, as I have said, while a witness of this kind may be entirely truthful when testifying, you should consider such testimony with more caution than that of other witnesses.

Given the facts of this case, the district court did not abuse its discretion in refusing to give a "perjured testimony" instruction.

### 3) *Examples of Misapplications of Bank Funds*

■■■■ Defendants argue that the district court "placed undue emphasis on the prosecution's theory by giving a charge which included 'examples' of misapplication of bank funds." They claim that such an emphasis was "prejudicial error."

The court's charge to the jury included four examples of acts constituting misapplications of bank funds:

> Misapplication of bank funds may be accomplished in several ways. I will now just give you some examples of what can constitute misapplication of bank funds, but I caution you that this is not an all-inclusive list. Other acts, which are not contained in this list, can constitute misapplication of bank funds. Examples of misapplication of funds are where:
> [four examples listed]
> . . . .
>
> You are reminded none of the above examples, or any act of the defendant, would be misapplication unless you find that the elements of the offense which I mentioned earlier have been proved beyond a reasonable doubt. This includes

proof that the defendant acted knowingly and willfully with the intent to injure or defraud the bank.

These examples are just ways that the offense of misapplication of bank funds may be committed. They may or may not fit the allegations in this indictment. You must separately consider the allegations which the Government has made in each count of the indictment and determine whether the evidence shows beyond a reasonable doubt that the defendants are guilty of the offense that is alleged in that count.

Before the charge was given, defendants' attorneys argued that either no examples should be used, or that examples of every type of misapplication should be given. The court indicated its intent to use four examples and, upon defendants' objections, asked whether defendants' counsel wished to submit additional examples. Defendants' counsel declined to do so.

The instructions merely helped clarify application of the relevant statute to complex financial transactions. The court did not abuse its discretion by listing the four examples along with the cautionary instructions.

## D. *Evidentiary Rulings*

Defendants argue that the court erred in various evidentiary rulings, claiming that the risk of substantial unfair prejudice to defendants clearly outweighed the probative value under Fed.R.Evid. 403 of the challenged testimony. Specifically, defendants argue that Hunt's testimony regarding his belief concerning the intent necessary to misapply bank funds should not have been admitted. They also argue that the testimony of Oldham, a former Quadel salesman, should have been admitted.

### 1) *Hunt's testimony*

■ The district court found Hunt's understanding of the misapplication of bank funds statute relevant because the testimony concerned his plea agreement. A witness' understanding of his plea agreement is appropriate for the prosecution to bring out on direct examination. *United*

States v. Walker, 871 F.2d 1298, 1303 (6th Cir.1989).

Hunt was not permitted to legally interpret the statute but rather was permitted to give his understanding of its relevance to his plea. His interpretation was not incorrect and caused no prejudice to defendants. The district court did not abuse its discretion in allowing Hunt to testify on this matter.

### 2) *Oldham's testimony*

■ Defendants argue that Oldham, a former Quadel salesman, should have been allowed to testify regarding prior bad acts of Watson. They wanted to show that Watson had previously misused escrow funds and misappropriated partnership funds.

Federal Rule of Evidence 608(b) governs admission of such evidence and provides as follows:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Defense counsel stated that they wanted to use Oldham's testimony to rebut Watson's testimony regarding the Park Place investment and to attack Watson's credibility. The district court correctly pointed out that Rule 608(b) prohibits such extrinsic evidence regarding credibility and that defense counsel are "stuck with" the response given on cross-examination. Exclusion of this testimony by Oldham was a correct application of Fed.R.Evid. 608(b).

## 3. *Defendants' Right to a Fair Trial*

### A. *Alleged Prosecutorial Misconduct*

Defendants claim that the government was guilty of numerous acts of prosecutori-

al misconduct which prevented defendants from receiving a fair trial. Specifically, they contend that the government: 1) injected civil standards of professional conduct into the trial; 2) improperly appealed to class prejudice through references to defendants' lifestyles; 3) improperly referred to unrelated criminal activity such as the Butcher bank failures; 4) withheld *Brady* material; and 5) committed other acts of misconduct.

We have held that "[t]o warrant a new trial, ... prosecutorial misconduct 'must be so pronounced and persistent that it permeates the entire atmosphere of the trial.' Furthermore, the prejudicial effect of improper comment or questioning may be negated by curative instructions to the jury." *United States v. Thomas*, 728 F.2d 313, 320 (6th Cir.1984) (citations omitted). We consider each of defendants' contentions separately.

### 1) *Injection of Civil Standards*

■ The district court granted Frost's motion *in limine* to exclude evidence concerning violations of civil standards of professional conduct for accountants. Defendants claim that, at trial, the government violated the order, injected civil standards, and thus apparently led the jury to believe that violation of civil standards constituted a criminal offense.

During cross-examination of Frost, the prosecutor commented, "Isn't that unethical?" to Frost's response that he received a commission from Quadel from the money invested by his clients pursuant to his advice. Defense counsel objected and the court sustained the objection. The court gave the following curative instruction:

> Ladies and gentlemen of the jury, I have sustained the Defense's objection to this, and I would just remind you that, as I told you earlier in the case and will tell you again before it's all over, that questions and comments by the lawyers are not evidence in this case.

When later instructing the jury, the court again cautioned the jurors:

> A violation of a bank rule, bank policy, state statute or federal banking regula-

tion is not in itself a criminal offense. However, whether the defendant knowingly and willfully failed to abide by a bank rule, bank policy, state statute or federal banking regulation may be considered by you on the question of whether the defendant knowingly or willfully acted with intent to defraud the bank.

Frost argues that "[t]he brief curative instruction given by the court could not possibly overcome the prejudicial injury which resulted to Frost" because of the above-quoted remark. Griffin asserts that "the jury was led to believe that guilt was established solely by the issue of nondisclosure in violation of certain bank policies and state and federal statutes relating to insider loans." We disagree

The instructions to the jury clearly established that defendants were not to be convicted for conduct which violated civil standards. Defendants were not denied a fair trial on that basis.

### 2) *Comments Concerning Lifestyle*

■ Defendants also argue that the prosecutor's references to their lifestyles constituted misconduct and denied them a fair trial. They assert that the "references to ... lifestyle and financial success had no purpose other than to appeal to the class prejudice and bias of the jurors." Again we disagree.

Counsel for both defendants referred to lifestyle during their opening arguments in an attempt to show that Norman Watson had a motive (supporting an extravagant lifestyle) for his criminal activity. Frost's counsel made the following statements:

> Who are the criminals here? I think that will be pretty clear from the proof when you hear all the proof. Norman Watson's entire being, his entire persona or the way he gets through life is to—is an appearance of wealth. He has to appear wealthy, and he came to Chattanooga and, boy, did he appear wealthy.

> He is wearing fur coats, a man wearing fur coats, and had diamonds on his hand and he's driving the fanciest cars and living in the biggest houses, buying

condominiums, flying around in a Lear jet, going to every football game he can go to, and taking people and girlfriends, went on an around-the-world tour with his girlfriend, took about three months off, and then after they got back, they honeymooned in Tahiti. That's the kind of fast lane that Norman Watson was living in. But let me tell you, there wasn't anything behind it. There wasn't any substance to it. It was a house of cards.

And these guys thought he had money, and they thought he was successful, and they invested in him. And look what it's got them. That's the kind of person Norman Watson is.

Griffin's counsel also pointed to the lifestyle of Norman Watson during his opening argument.

All I know is who had the motive in 1981 to bribe a banker? I know who had the reasons in 1981 to buy a banker, and I'm going to prove it to you. Watson duped this man right here, he duped him.

. . . .

They were dealing with a wheeler-dealer. That's what they were dealing with, a wheeler-dealer, Norman Watson, an oil and gas man, never would have trusted him, anyway. Real estate syndicator. That's what the man was. Fancy brochures put together by fancy lawyers and fancy accountants. That's how he sold these people. They looked pretty, looked pretty.

. . . .

But the real reason all of this has ended up in the situation that it is now is that Mr. Griffin and Mr. Frost, if they had known the background of Mr. Watson, they would have never gone in with him. He gave the illusion, the illusion of success. He proves the old adage, that all is not gold that glitters. He had a lavish lifestyle, as Mr. Dickson has alluded to. He spent money like it was going out of style.

Only thing is, he was spending borrowed money. He was spending stolen money.

Defendants claimed at trial that, although Watson had a motive to bribe a banker, they did not. The government argues that its references to defendants' lifestyles were relevant to their motives for committing the charged acts. The district court found the evidence relevant, noting:

It should be kept in mind that this case was generally about whether the defendants had wrongfully taken money from a bank. During the trial, the defendants claimed to be penurious. If this were a bank robbery trial, evidence of spending on the part of the robber would be admissible. Such evidence is not necessarily inflammatory in this case because these defendants wear white collars.

We agree. Defendants were not deprived of a fair trial by the prosecutor's conduct in this area.

### 3) *Comments Concerning Activities of Others*

Defendants argue that remarks by the prosecutor concerning the activities of others carried "strong prejudicial overtones" and denied them a fair trial. Defendants identify a variety of comments but they focus on the prosecution's references to the failed "Butcher banks" and to Benedict Arnold and Judas Iscariot.

### a) *Butcher banks*

█ Defendants assert that the prosecution improperly tried to associate defendants with the principals, Jake Butcher and Jesse Barr, involved in the failure of United American Bank of Hamilton County, a "Butcher bank."

Anyone who lives in the Chattanooga or Knoxville area knows the names of Jake Butcher and Jesse Barr and any implied comparison of a defendant's activities to the activities of either Butcher or Barr would, without a question, arouse the emotions of jurors and cause feelings of prejudice against the defendants.

In fact, Griffin's attorney brought up the Butcher bank failure in his opening statements as he tried to show that Norman Watson, rather than defendants, was to blame for the instant situation.

They have all become victims of Mr. Watson. The Pioneer Bank is a victim of Mr. Watson. But they are not the only bank that is a victim of Mr. Watson.

When he moved to Chattanooga in 1982, it was no accident. He came here by design. He came here for a reason. He came here because he did have banking contacts in this community. Who were his banking contacts with? The proof will show who his banking contacts were with. Not Pioneer, but with a Butcher bank in this community. His contacts were with a lady banker at the United American Bank of Hamilton County. That was a Butcher bank. It failed, if you remember, in 1983.

Watson came here in 1981, 1982, to take people's money and to borrow money. He first borrowed money, as far as I can tell, from the United American Bank in Hamilton County to the tune of $2,700,000.

. . . .

[H]e came to Chattanooga and the proof will show beyond any doubt that when he came to Chattanooga, that Mr. Watson personally was not creditworthy.

. . . .

How does the proof show that he wasn't creditworthy? We know that the Butcher bank failed in 1983, we know that the FDIC went into that bank in November of 1982 and examined that bank.

What did they examine? They examined Quadel's loans. We'll show you what they found. They classified the loans at UAB Hamilton County in 1982 of Mr. Watson, Mr. Webb and Quadel as substandard. The FDIC found these loans not to be creditworthy. Yet, they get millions of dollars. That's not too surprising at a Butcher bank, but the surprise is that they get a commitment from the Pioneer Bank.

In light of the statements of defense counsel, the prosecutor's remarks concerning the Butcher banks were not improper and did not deny defendants a fair trial.

### b) *Benedict Arnold and Judas Iscariot*

■ Defendants also argue that the prosecutor's remarks concerning Benedict Arnold and Judas Iscariot were improper. In his closing statement, the prosecutor analogized defendants' attempt to show their good character to the fact that Benedict Arnold and Judas Iscariot were men of good character who still "g[ot] in trouble."

They've put in their character, but let me just tell you a little about character evidence. It's a bad thing for a man of good character to get in trouble. Benedict Arnold, when he betrayed his country, had as fine a character as any man in this Nation. Judas Iscariot, the disciple, when he betrayed his Lord, had as fine a character as anyone in the land, but unfortunate as it is, men who can show good character, which stands as a witness for them frequently commit offenses against the law, and it is your responsibility as jurors to determine whether or not these defendants committed the offenses of which they are charged.

Mr. Hunt probably had a very good character, but he committed an offense. Mr. Watson, who had been appointed by the President of the United States as Undersecretary of Housing and Urban Development, and later confirmed by the Senate of the United States, probably had a fine character, but as stated, men who have good character violate the law.

Ladies and gentlemen of the jury, Mr. Frost and Mr. Griffin did enter into a conspiracy to defraud and to deceive the Pioneer Bank to bribe a banker by the payment of this money to him and to cause and aid and abet in the misapplication of the monies and funds and credits of the Pioneer Bank.

The government defends its actions by citing *United States v. Medlin*, 353 F.2d 789, 795 (6th Cir.1965), *cert. denied*, 384 U.S. 973, 86 S.Ct. 1860, 16 L.Ed.2d 683 (1966), a case in which we refused to find plain error under circumstances almost identical to those in the instant case. There, as in this case, defense counsel failed to object to the argument in question

so we analyzed for plain error. The prosecution in *Medlin* warned the jury during closing argument, in language repeated almost verbatim by the prosecutor in this case, that men of good character, such as Benedict Arnold and Judas Iscariot, frequently commit offenses. *See id.*

Defendants argue that the prosecutor's remarks require the granting of a new trial as in *United States v. Steinkoetter*, 633 F.2d 719 (6th Cir.1980). In *Steinkoetter*, however, the prosecution directly compared the defendant to Pontius Pilate and Judas Iscariot: "How can she now come in like Pontius Pilate and wash her hands of it? How can she like Judas Iscariot sit in there and enjoy refreshments with a lady whose death right then is being planned, and a bomb being planted?" *Id.* at 720. In *Medlin*, a case not overruled, and in the instant case, the prosecution used Benedict Arnold and Judas Iscariot as examples of men with good characters who had "gone bad" rather than as direct comparison models for defendants.

We do not approve of the prosecutor's references to Benedict Arnold and Judas Iscariot, names that connote, for many, singularly evil behavior. However, we note that no objection was registered by defense counsel, a fact that raises our standard of review to evaluation for "plain error."

Plain error has reference to "particularly egregious" errors and is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982). We are unable to say that the analogous manner in which the prosecutor made reference to two historic names was so "egregious" as to result in a miscarriage of justice.

#### 4) *Alleged Withholding of Brady Material*

 Defendants argue that the prosecution wrongfully withheld material that should have been released pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Frost fails to specifically identify the material allegedly with-

held and Griffin mentions *Brady* material "including statements made by Hunt and Watson to the FBI."

As we have recently discussed,

> while the *Brady* rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure. If it fails to comply adequately with a discovery order requiring it to disclose *Brady* material, it acts at its own peril. *See Pennsylvania v. Ritchie*, [480 U.S. 39], 107 S.Ct. [989] at 1003 [94 L.Ed.2d 40 (1987)]; *accora* [*United States v.*] *Bagley*, 473 U.S. [667] at 682–83, 105 S.Ct. [3375] at 3384 [87 L.Ed.2d 481 (1985)]. But significantly, if the government does fail to disclose *Brady* material, the defendant has a constitutional remedy for the nondisclosure *only* if the defendant can show that there is a reasonable probability that "the omission deprived the defendant of a fair trial." [*United States v.*] *Agurs*, 427 U.S. [97] at 108, 96 S.Ct. [2392] at 2400 [49 L.Ed.2d 342 (1976)].

*United States v. Presser*, 844 F.2d 1275, 1281–82 (6th Cir.1988). Defendants have failed to meet their burden.

The court noted that defendants had received the FBI "302 reports" in time for cross-examination and offered to give defense counsel more time to examine the reports, if they wished, before cross-examination of the government witnesses. The court explicitly found no prejudice and we agree. Thus, defendants were not denied a fair trial by a withholding of *Brady* material.

#### 5) *Other Acts of Misconduct*

 Defendants claim that prosecutorial misconduct involving other various acts, including, among other things, witness intimidation and misstatements in the government's final argument, deprived them of a fair trial. We have carefully considered defendants' arguments and examined the record. We find no prosecuto-

rial misconduct rising to the level of a constitutional violation.

Although defendants use a "machine gun" approach to identifying alleged acts of misconduct, the various acts alleged, even if true, do not individually or cumulatively "permeate the atmosphere of the trial." Additionally, the district court issued curative instructions when appropriate. Thus, defendants were not denied their right to a fair trial by reason of prosecutorial misconduct.

### B. Allegedly Improper Cross–Examination

■ Defendants argue that the district court abused its discretion by allowing "improper" questions during cross-examination of defendants' character witnesses. The court allowed questions on whether the witnesses' opinions of defendants' reputations would change if they had heard about Frost cheating his clients and partners or violating accounting principles, and if they had heard about Griffin not reporting all of his income. Defendants argue that since they presented character evidence by way of reputation evidence rather than opinion evidence, the only acts permitted to be mentioned in cross-examination questions are those acts likely to have been known in the community. In that, defendants are mistaken.

The Supreme Court has indicated that a district court has broad discretion in this area.

> Both propriety and abuse of hearsay reputation testimony, on both sides, depend on numerous and subtle [sic] considerations difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will Courts of Appeals disturb rulings of trial courts on this subject.

*Michelson v. United States,* 335 U.S. 469, 480, 69 S.Ct. 213, 220–21, 93 L.Ed. 168 (1948) (footnote omitted).

Federal Rule of Evidence 405(a) establishes the methods allowed to introduce character evidence and the general scope of cross-examination.

**(a) Reputation or opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

Fed.R.Evid. 405(a). As we have noted, "relevant specific instances of conduct are only instances going to the accuracy of the character witnesses' testimony. If, as here, their direct testimony is addressed to community reputation, inquiry may be made about conduct, and even about charges, which may have come to the attention of the relevant community." *United States v. Curtis,* 644 F.2d 263, 268 (6th Cir.1981) (emphasis deleted) (citations omitted), *cert. denied,* 459 U.S. 1018, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982).

The Advisory Committee on the Federal Rules of Evidence has commented on the theory of allowing such cross-examination:

> According to the great majority of cases, on cross-examination inquiry is allowable as to whether the reputation witness has heard of particular instances of conduct pertinent to the trait in question. *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Annot., 47 A.L.R.2d 1258. The theory is that, since the reputation witness relates what he has heard, the inquiry tends to shed light on the accuracy of his hearing and reporting.

Fed.R.Evid. 405 (Advisory Comm. Notes).

The district court conducted a sidebar discussion concerning the issues the government planned to address in cross-examining defendants' character witnesses. The court required proof as to the government's knowledge of the acts and disallowed questions on certain acts. Allowing the government to ask defendants' reputation character witnesses if they had heard of specific acts of conduct was not an abuse of discretion by the district court and, indeed, was a textbook application of Fed.R.Evid. 405(a).

## C. *Polling of the Jury*

■ Defendants argue that the district court erred in the polling of the jury. They claim that the court attempted "to extract unanimity by questioning from the bench." We disagree.

When polled by the clerk, each member of this jury replied yes, the verdict just read was his or her verdict. After the polling, the district court thanked the jurors and warned them about questions from the press and the attorneys. It was in that context that the question from Foreperson Middlebrook arose, the exchange complained about by defendants.

THE COURT: ... The Court thanks you for your service. It's been, as I say, it's been a long time. You've heard a lot of proof.

. . . .

Serving on a jury is [a] civic duty, a very important one, and you have performed that very well.

You are going to be asked probably by members of the press or others about your deliberations. It's up to you to respond. If you want to answer anybody's questions, you can do that, or you need not do that. It's completely, it's completely up to you.

. . . .

The attorneys in the case will not be permitted to ask you any questions, so if any of the lawyers ask you any questions, I would, you should—I don't think any of them will, but I just tell you that, but other people might. Any questions about that? Okay. Yes, ma'am.

FOREPERSON MIDDLEBROOK: Can I make a statement without getting too specific as to the process or the wording of the indictments caused—

THE COURT: No ma'am. I would prefer you not to make any such statement at this time unless, unless you want to say, unless anybody wants to say that the verdict was not—was not as has been announced in the court.

FOREPERSON MIDDLEBROOK: It was very difficult, the wording.

THE COURT: Well, let me just ask you this. You were polled as to what your verdict was. Was your verdict guilty on all counts for both Defendants?

FOREPERSON MIDDLEBROOK: (Nodding head affirmatively). THE COURT: You need to say verbally yes or no—

FOREPERSON MIDDLEBROOK: Oh. She's asked me before.

THE COURT: —so the reporter can get that down.

FOREPERSON MIDDLEBROOK: Yes.

THE COURT: All right. Okay. You are now excused.

Polling of the jury enables a court to ascertain "that one of the prerequisites of a valid verdict—unanimity—has been achieved." *United States v. Love*, 597 F.2d 81, 85 (6th Cir.1979). Such a valid polling occurred here. Defendants were not denied a fair trial by the polling of the jury.

### 4. *Sentences*

#### A. *Imprisonment*

■ Defendants assert that the district court abused its discretion by imposing prison sentences which are too lengthy. They argue that the disparity in the prison sentences of the four individuals involved, Frost, Griffin, Watson and Hunt, necessarily leads to the conclusion that Frost and Griffin "were punished for exercising [their] constitutional right to a jury trial." [7]

The Supreme Court has held, with respect to presentence guidelines sentences, that "once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Dorszynski v. United States*, 418 U.S. 424, 431, 94 S.Ct. 3042, 3047, 41 L.Ed.2d 855 (1974) (footnote omitted). We have noted that "[i]t is axiomatic

**7.** Frost received an effective sentence of 9 years imprisonment and Griffin received a total of 4½ years. Hunt and Watson both cooperated with the government and received lesser sentences. The court noted that it had given Hunt "credit for his cooperation." Watson was sentenced by a different court, pursuant to a Rule 20 transfer.

that the imposition of sentences within the statutory limits lies almost entirely within the discretion of the trial judge." *United States v. Stull,* 743 F.2d 439, 448 (6th Cir. 1984), *cert. denied,* 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). The prison sentences imposed on defendants are within the applicable statutory limits.

Our inquiry, however, is not at an end yet because "it is improper for a district judge to penalize a defendant for exercising his constitutional right to plead not guilty and go to trial, no matter how overwhelming the evidence of his guilt." *United States v. Derrick,* 519 F.2d 1, 3 (6th Cir.1975). Defendants argue that such a penalty was involved here, but the record fails to support their claims. Mere disparity in sentences is insufficient to show that the sentencing court penalized Frost and Griffin for going to trial. Many factors may be considered in sentencing and nothing indicates that the district court considered an improper factor such as defendants' exercise of their constitutional right to a trial.

### B. *Restitution*

 Griffin argues that the district court abused its discretion by ordering restitution of $800,000 since Griffin's financial statement "clearly shows a negative net worth." Frost argues that the district court "either failed to follow the mandatory procedure set forth in the statute [18 U.S.C. § 3664(a)], or ignored the uncontroverted facts presented by Frost." Like Griffin, Frost contends that his financial statements reflect a negative net worth and an inability to make restitution.

When sentencing a defendant for the offenses involved in this case, a court may order restitution. 18 U.S.C. § 3663(a) (1). In determining such an order, the district court is "vested with wide discretion." *United States v. Anglian,* 784 F.2d 765, 768 (6th Cir.1986) (quoting *Williams v. Illinois,* 399 U.S. 235, 243, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586 (1970) ), *cert. denied,* 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986). The court "shall consider the amount of the loss sustained by any victim

as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3664(a). The statute does not require the court to make specific findings concerning a defendant's financial condition and we have held that a court need not make such findings. *See United States v. Purther,* 823 F.2d 965, 969 (6th Cir.1987). The burden of showing a defendant's financial resources and needs rests on the defendant. 18 U.S.C. § 3664(d).

Here, both defendants submitted financial statements. The court considered the factors listed in section 3664(a). At the hearing concerning defendants' financial information, the court noted that Frost and Griffin each had liability to the bank in excess of $3 million. The court also commented on the fact that Griffin's December 1988 statement showed assets worth more than $1,900,000, while part of the liabilities listed were the liabilities to the bank which are the subject of this case. Frost's joint financial statement with his wife in May 1988 showed assets in excess of $3 million and a net worth of $500,000. The Frosts' joint statement in December 1988 showed assets in excess of $700,000 and a net worth over $400,000 but Frost's individual statement of the same date showed a negative net worth of $3,500,000.

The district court considered the appropriate factors and did not abuse its discretion in determining that $800,000 restitution is appropriate for both Frost and Griffin.

### IV.

For the reasons given above, we AFFIRM the judgment and sentences as to both defendants.